UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

|  |  |  |
|---|---|---|
| RICKY LEE BROYLES, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:03-cv-605 |
| | ) | |
| v. | ) | Honorable Wendell A. Miles |
| | ) | |
| JOHN CASON, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| _____ | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Because Petitioner filed his habeas application after the enactment of the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA), the provisions of that law govern the scope of the Court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).

On May 26, 1999, after a jury trial in the Van Buren County Circuit Court, Petitioner was convicted of voluntary manslaughter, MICH. COMP. LAWS § 750.321. On June 28, 1999, Petitioner was sentenced as a third habitual offender to nine to thirty years imprisonment. Petitioner is currently incarcerated at the G. Robert Cotton Correctional Facility. As stated verbatim from his *pro se* petition, Petitioner raises the following six grounds for habeas corpus relief:

> **I.     THE CONVICTION OF THE DEFENDANT SHOULD BE REVERSED WHERE THE JUDGES RESPONSE TO THE JURY'S QUESTION (1) REMOVED FROM THE PROSECUTION THE BURDEN OF PROOF TO PROVE EVERY ELEMENT OF THE CRIME, (2) REMOVING FROM THE PROSECUTION THE BURDEN TO PROVE BEYOND A REASONABLE DOUBT THAT DEFENDANT DID NOT ACT IN SELF DEFENSE, IN VIOLATION**

OF THE STATE AND UNITED STATES FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW.

II.     THE CONVICTION OF THE DEFENDANT SHOULD BE REVERSED WHERE POLICE (1) NEGLECTED TO SECURE THE CRIME SCENE, ALLOWING EVIDENCE OF OTHER WEAPONS TO BE REMOVED FROM SCENE, ALSO (2) FAILING TO TAKE PICTURES OF THE CUT DEFENDANT HAD RECEIVED, AND WHERE (3) THE PROSECUTOR USED AND ALLOWED FALSE AND PERJURED TESTIMONY TO GO UNCORRECTED TO OBTAIN AN UNJUST CONVICTION, VIOLATING THE DEFENDANT'S STATE AND UNITED STATES FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW TO A FAIR TRIAL.

III.    DEFENDANT WAS DENIED A FAIR TRIAL BY THE INTENTIONAL AND REPEATED INSTANCES OF PROSECUTORIAL MISCONDUCT WHICH DENIED DEFENDANT HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW.

IV.     DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A JURY VENIRE SELECTED FROM A FAIR CROSS-SECTION OF THE COMMUNITY WHERE ONLY ONE OUT OF THE SIXTY-FIVE DRAWN IN THE JURY VENIRE WAS AFRO-AMERICAN, DESPITE THE COUNTY'S POPULATION BEING 6.7% AFRO-AMERICAN, IN VIOLATION OF THE JURY SELECTION ACT IF 1968.  28 U.S.C. §§ 1861, VIOLATING THE DEFENDANT'S STATE, AND FEDERAL CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW.

V.     THE JURY VERDICT IN THIS MATTER IS AGAINST THE GREAT WEIGHT OF THE EVIDENCE AND SHOULD BE REVERSED BY THE COURT AS VIOLATIVE OF THE STATE AND FEDERAL CONSTITUTIONAL GUARANTEE OF FUNDA-MENTAL FAIRNESS WHERE A FAIR REVIEW OF THE EVIDENCE REVEALS THAT THE DEFENDANT CLEARLY HAD A "HONEST AND REASONABLE" BELIEF IN THE NEED TO DEFEND HIS LIFE AND WAS ACTING IN SELF DEFENSE, AND WHERE THE JURY EXPRESSED THEY HAD FOUND THE DEFENDANT TO BE ACTING IN SELF-DEFENSE.

**VI.     THE DEFENDANT MEETS THE CAUSE AND PREJUDICE STANDARD OF MCR 6.508(D), BASED ON THE INEFFECTIVE ASSISTANCE OF APPEALS COUNSEL, WHICH RISES TO THE LEVEL OF SIXTH AMENDMENT VIOLATION, PRECLUDING DENIAL BASED ON DELAY AND DEFAULT WHERE A CLAIM OF JUSTIFIABLE SELF-DEFENSE IS AN ASSERTION OF ABSOLUTE INNOCENCE.**

Respondent filed an answer to the petition (docket #13) contending that the grounds should be denied because they are procedurally barred.  Upon review and applying the standards under the AEDPA, I find that petitioner's claims are procedurally defaulted.  Accordingly, I recommend that the petition be denied.

<u>**Procedural History**</u>

**A.  Trial Court Proceedings**

The state prosecution arose from the December 25,1998 death of Alexander Washington (Alexander) due to a severe head injury.  Petitioner was charged with open murder.  His jury trial began on May 18, 1999, and concluded on May 26, 1999.  Petitioner defended the charge on the grounds of self-defense.  The trial court directed a verdict of not guilty on first-degree murder, and instructed the jury on the elements of second-degree murder, voluntary manslaughter, and self-defense.  The jury convicted Petitioner of voluntary manslaughter.  On June 28, 1999, the trial judge sentenced Petitioner as a third habitual offender to nine to thirty years imprisonment.

All of the witnesses who were on the scene at the time of Alexander's death agreed that Alexander allowed his nine-year old daughter Tanesha to spend Christmas 1998 with Petitioner's mother, Ledora Turner (Ledora).  At the time, Alexander was living with Rosanna Broyles (Rosanna), Ledora's daughter and Petitioner's sister.  At approximately eight o'clock in the evening, Alexander, accompanied by his sister Annetta Washington (Annetta), arrived at Ledora's

home. Alexander entered Ledora's house through the back door directly into the kitchen, where Petitioner was preparing food. The witnesses' testimony as to what subsequently occurred is not so consistent.

Petitioner's niece Tamesha Broyles (Tamesha) testified that on Christmas Day 1998, she was at Ledora's house with her children and fiancee Berryon Moore (Berryon). (Trial Tr. vol. III, 225, May 20, 1999). She observed Alexander and Petitioner arguing in the kitchen, and Alexander pushing Petitioner. (Tr. III, 234). She and Petitioner's sister Patricia Tubner (Patricia) told Alexander to leave the house. (Trial Tr. vol. IV, 29, May 21, 1999). After Alexander left the house, he turned and began swearing at Tamesha and Patricia, who were standing in the kitchen doorway watching Alexander leave. (Tr. III, 237). Petitioner and Berryon came out of the house, and Petitioner told Alexander to get into his truck and leave. Berryon carried a baseball bat out of the house. (Tr. III, 239). Alexander, who was holding a baseball bat, pulled a knife and began swinging the knife and the bat at Petitioner. (Tr. 111, 238-39, 254). Alexander said, "I'm going to kill that mother fucker. . . ." (Tr. IV, 52). Tamesha observed Alexander slip and fall, and Petitioner hit Alexander approximately three times in the back with the baseball bat that Berryon had carried outside. (Tr. III, 252). She never saw Petitioner with a knife. (Tr. III, 254).

Berryon testified that when Alexander entered the house, Berryon "heard a pocket knife in Alexander's pocket." (Tr. IV, 61). Later, when he heard arguing outside, he left the house carrying an aluminum baseball bat. (Tr. IV, 65). Berryon observed Petitioner holding a 12- inch steak knife, (Tr. IV, 69), and saw Patricia give Petitioner the aluminum bat that Berryon had carried outside. (Tr. IV, 97). Berryon observed Alexander holding a small knife and a foam bat. (Tr. IV, 76). When Alexander swung the knife and bat at Petitioner, he slipped and fell. Petitioner then hit Alexander with the aluminum bat one time in the head (Tr. IV, 77), and two times on the side. (Tr.

4

IV, 78).

According to Patricia's testimony, she saw Alexander take a knife out of his pocket when he first entered the house. (Tr. IV, 111). Later, when Alexander and Petitioner had left the house, she observed both men swinging knives at each other. (Tr. IV, 126). After Alexander got into his truck, Petitioner began walking towards the house and Alexander jumped from the truck and ran after Petitioner holding a knife and a baseball bat. (Tr. VI, 130). Patricia handed Petitioner the aluminum bat. (Tr. IV, 133). Although she saw both men swinging bats, she never saw Petitioner actually hit Alexander. (Tr. IV, 140). As soon as she saw Alexander fall to the ground, she took the bat from Petitioner. (Tr. IV, 141).

Annetta testifed that Tanesha left the house first and ran to Alexander's truck where Annetta was waiting. (Trial Tr. vol. II, 191, May 19, 1999). Tanesha was screaming that "they are going to kill my daddy." (Tr. II, 191, 194). When Alexander left the house, Tamesha and Patricia were screaming and cursing at him. (Tr. II, 194). Petitioner followed Alexander into the yard carrying a knife. (Tr. II, 198, 200). Petitioner brandished the knife at Alexander, and eventually pinned Alexander against the house. (Tr. II, 207). Alexander removed a small pocket knife from his pocket. (Tr. II, 209). Patricia began pushing Petitioner towards the house, and Alexander started to get into his truck. Petitioner pulled away from Patricia, and approached the truck holding his knife and a baseball bat that had been brought outside and dropped on the lawn by another guest. Petitioner slammed the door on Alexander's leg and began rocking the truck while Tamesha attempted to pull him away. (Tr. II, 212, 214). When his truck would not start, Alexander got out of the truck carrying his daughter's toy baseball bat. (Tr. II, 223). Petitioner began swinging the aluminum baseball bat at Alexander. (Tr. II, 220). Alexander backed away from the truck, and

5

slipped down onto one knee. (Tr. II, 229). Petitioner began repeatedly hitting Alexander in the head with the aluminum baseball bat. (Tr. II, 230, 240, 242). When the police arrived, Petitioner dropped the baseball bat and Patricia took his knife and told Tamesha to put it in the house. (Tr. II, 243).

Officer Massura testified that on December 26, 1998, while on regular patrol duty with Officer Cobb, they observed an argument taking place in Ledora's yard. ( Tr. III, 97-99). When Officer Massura drove into the driveway, he observed a male lying face down in the snow, Annetta lying over the body, and Patricia walking away from the body carrying a red baseball bat. He also observed Petitioner standing next to the male body making kicking motions. (Tr. III, 100-102). Finally, he observed Tamesha and Berryon walking away from the body towards the house. (Tr. III, 100-01). Officer Massura retrieved the aluminum baseball bat from Patricia, and located a two-foot foam baseball bat lying ten feet from Alexander. (Tr. III, 110). The police did not locate any knives at the scene. (Tr. III, 111). In all material ways, Officer Cobb's testimony was identical to that of Officer Massura. (*See* Trial Tr. vol. VI, 219-45, May 21, 1999).

Steven Blair testified that on December 26, 1998, at a police officer's request, he towed Alexander's truck from Ledora's house to the lot of Blair's Towing Service. (Tr. III, 6). The truck remained at Blair's Towing Service for approximately two weeks. (Tr. III, 7). During this time, there were problems with the truck which caused it to occasionally fail to start. (Tr. III, 6-21).

Forensic pathologist Doctor Stephan Cohle conducted an autopsy on Alexander. He observed scrapes and bruises on Alexander's back, left side of the head, and left center of the forehead; pattern bruises on Alexander's left upper back; and a large black eye on the left. (Tr. III, 138-140). Doctor Cohle opined that the two vertical parallel bruises were caused by one blow by the same weapon. (Tr. III, 139). Internally, there was extensive hemorrhaging beneath the scalp, and

17 pieces of fractured bone in the floor of the skull. (Tr. III, 142). Based upon his external and internal examination, Dr. Cohle concluded that the injuries were caused by blows with a heavy, blunt object, which could be a baseball bat, (Tr. III, 149), and that there had been between three and six blows. (Tr. III, 164). The doctor testified that if the weapon was a baseball bat, it would have taken multiple blows to cause the extensive injuries, (Tr. III, 149), and the baseball bat would have had to be swung with all of the force of an adult male. (Tr. III, 154). According to Doctor Cohle, if the initial blow to the head had caused a linear fracture, Alexander would have been stunned or knocked out, and would not be responsive. (Tr. III, 163-164). Blood tests revealed the presence of alcohol and an anti-epileptic drug in Alexander's system. (Tr. III, 174-75).

Patricia's son Darrius testified that he was in the kitchen when Alexander entered Ledora's house. According to Darrius, when Alexander entered the house he pushed Petitioner and stated he was going to kill him. (Trial Tr. vol. V, 23, May 25, 1999). Alexander pulled out a knife and waived it in the air (Tr. V, 26), at Petitioner, and at Tamesha. (Tr. V, 31). At some time after Alexander and Petitioner had gone into the yard, Darrius heard Tamesha shout that Alexander was getting a gun. (Tr. V, 24). Darrius then called 911. (Tr. V, 25). Ledora testified that she was sleeping when Alexander arrived, but woke up when she heard a commotion and her children telling Alexander to get out of the house with that knife. (Tr. V, 36). She did not see what happened outside of the house. (Tr. V, 41).

Rosanna testified that she arrived at Ledora's house after receiving a telephone call from Darrius. She observed Annetta flag down two men in a pickup truck and ask if they would drive Alexander's truck to his home. Annetta and the two men got into Alexander's truck, but Rosanna did not see if they removed anything from the truck. A police officer at the scene instructed

them to exit the truck.  (Tr. V, 45).  Rosanna also testified that at times during their relationship Alexander was violent, (Tr. V, 46), and since the previous summer had been drinking vodka every day. (Tr. V, 49).  Alexander owned pistols and shotguns, was known to carry a pistol, (Tr. V, 53), and carried a knife every day. (Tr. V, 60).  Rosanna had never noticed Alexander having trouble starting his truck. (Tr. V, 50).

Petitioner testified in his own defense.  He testified that upon entering the house, Alexander immediately stepped on Petitioner's foot and shoved him with his forearm.  (Tr. V, 65). When Petitioner told Alexander to take his problem somewhere else, Alexander pushed Petitioner down to the floor.  When Petitioner looked up, Alexander was standing over him with a steak knife stating that he was going to kill Petitioner.  (Tr. V, 66-67).  When Petitioner saw Alexander threatening Petitioner's niece with the knife, Petitioner grabbed a knife to stop Alexander from attacking.  (Tr. V, 67).  When both men were outside, Alexander finally climbed into his truck and Petitioner began to walk back to the house.  Alexander then shouted he was going to kill Petitioner, and when Petitioner glanced back he saw Alexander reaching behind the seat of his truck.  He heard someone shout that Alexander was getting a gun.  (Tr. V, 71).  Petitioner began to run.  He slipped on the ice and dropped the knife,  and then began running to the side of the garage to get out of the line of fire. (Tr. V, 68).  Alexander then approached him while swinging a baseball bat.  Patricia handed Petitioner an aluminum baseball bat, and Petitioner hit Alexander on the left side of the head. When Alexander fell, his hand came up and Petitioner thought he had a gun, so he hit him two more times.  Petitioner began backing away, Patricia took the aluminum baseball bat, Annetta began running towards Alexander and fell on top of him.  At that point, the police pulled into the driveway. (Tr. V, 69).  Petitioner never saw Alexander fall during the melee.  He never hit Alexander while

Alexander was lying on the ground.  Petitioner further testified that on several occasions he had seen Alexander with a gun, (Tr. V, 71-72), and was aware of Alexander's violent propensities.  (Tr. V, 74).  Petitioner believed his life was in danger. (Tr. V, 71).

### B.  Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals, raising the following two issues:

I.      Was Defendant denied the right to due process of law where the trial court failed to inform the jury of the relevant legal criteria in response to a jury question regarding a key issue in the case?

II.     Was Defendant denied a fair trial by the prosecutor's intentional misconduct in asking him, on cross examination, if his conviction for attempted breaking and entering was for breaking into a church?

The Court of Appeals noted Petitioner's default in failing to object to either claim presented, and proceeded to review both claims for plain error affecting Petitioner's substantial rights.  In an unpublished opinion, the Michigan Court of Appeals affirmed Petitioner' conviction on April 24, 2001. (Mich. Ct. App. Op. (MCOA), docket #25).

Petitioner filed a delayed *pro se* application for leave to appeal to the Michigan Supreme Court, raising the same two issues presented and rejected by the Michigan Court of Appeals, and presenting the following five additional issues:

I.      Where the jury expressed that they found Defendant's first blow to be in self-defense, confirming that they had found the Defendant to have an "honest" and "reasonable" belief in the need to defend his life, did conviction deprive Defendant of the right to defend his life from serious bodily injury or death?

II.     Where the prosecutor failed to prove beyond a reasonable doubt that Defendant did not act in self-defense was the Defendant denied his right to the due process of law?

III.    Was Defendant denied his federally guaranteed right to a fair trial, where the court admitted into evidence a photo of the deceased's skull that had been cut off by the pathologist?

IV.    Was Defendant denied his federally guaranteed right to a fair trial where the pathologist, a biased witness, based his testimony on a conjecture that only the tip of the bat had connected with the victim's head and not from medical science?

V.     Was the Defendant denied his Sixth Amendment right to be tried by a jury selected from a fair cross-section of the community, where out of the sixty-five member panel only one juror was black?

By order entered October 29, 2001, the Michigan Supreme Court denied Petitioner's delayed application for leave to appeal because the court was not persuaded that the questions presented should be reviewed. (*See* Mich. Order. docket #26).

### C. Post-Conviction Relief

Petitioner filed a motion for relief from judgment pursuant to Michigan Court Rule 6.500 *et seq.* in the Van Buren Circuit Court raising the following six issues:

I.      The judge's response to the jury's question removed from the prosecution the burden of proof to prove beyond a reasonable doubt that Defendant did not act in self-defense.

II.     The Defendant's conviction should be reversed because of police negligence, and because the prosecutor used and allowed false and perjured testimony to obtain an unjust conviction

III.    Defendant was denied a fair trial by the repeated instances of Prosecutor misconduct.

IV.    Defendant was denied his Sixth Amendment right to a jury venire selected from a fair cross-section of the community.

10

V.     The jury verdict in this matter is against the great weight of the evidence where the jury expressed that they had found the defendant to be acting in self-defense.

VI.    Defendant was denied effective assistance of appallate counsel, which rises to the level of a Sixth Amendment violation.

The trial court denied the motion on July 11, 2002. (*See* Attach. to Pet., docket #1).  Both the Michigan Court of Appeals and Michigan Supreme Court concluded that Petitioner failed to meet the burden of establishing entitlement to relief under MICH. CT. R.  6.508(D), and accordingly, denied leave to appeal on March 20, 2003 and August 29, 2003, respectively.

## Standard of Review

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d

11

at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court; (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the fact of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable."  *Williams*, 529 U.S. at 410.

---

**Discussion**

I.  Procedural Default

The doctrine of procedural default is applicable where a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts and the procedural rule is "adequate and independent." *See Monzo v. Edwards*, 281 F.3d 568, 575-76 (6th Cir. 2002).  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster,* 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).  If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim "will result in a fundamental miscarriage of justice."  *Hicks*, 377 F.3d at 551-52.  A "fundamental miscarriage of justice" will result "where a constitutional violation has probably resulted in the conviction of one who was actually innocent."  *Murray v. Carrier*, 477 U.S. 478, 495 (1986).

As discussed below, each of Petitioner's claims is procedurally defaulted.

II.  Ground I

As his first ground for relief, Petitioner claims that he was denied due process where the trial court failed to re-instruct the jury on the crime of manslaughter, or to provide the jury with written instructions.  After it began its deliberation, the jury asked: "If the first blow is thought of self-defense, can you consider anything thereafter manslaughter because you think it is too violent?" (Tr. VI, 4-5).  The trial judge responded by again reading the instructions on self-defense. He then referred the jury to the written instructions on self-defense that had been provided at the time the jury began deliberating, and advised the jury to "be directed by what those instructions are."  (Tr. VI, 4-5).  Petitioner claims the trial judge's response removed from the prosecution the burden of proving (1) each element of the crimes with which Petitioner was charged and (2) that Petitioner did not act in self-defense.  Petitioner raised the issue on direct appeal to the Michigan Court of Appeals.  After expressly noting that Petitioner had not preserved the issue with a contemporaneous objection, the Michigan Court of Appeals reviewed Petitioner's claim for plain error, finding none.  In addressing this claim, the Michigan Court of Appeals stated:

> The jury never requested any additional instruction on the elements of voluntary manslaughter.  Nor did the jury express confusion regarding that offense.  Absent a request by the jury, it is not error to fail to reiterate the previous instructions concerning the charges involved . . . Likewise, it is not error for a trial court to fail to reinstruct a jury on on the elements of voluntary manslaughter, when the trial court's initial instructions were clear and the jury did not express confusion regarding the offense.
>
> Although the jury did express some difficulty with regard to the scope of self-defense, the trial court's decision to refer the jury back to the written instructions it had previously provided was not error.

(MCOA at 1) (internal citations omitted).

14

In this circuit, "plain error review does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (citations omitted); *see also Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001); *Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir.1991) (same); *Paprocki v. Foltz,* 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"). Therefore, Petitioner failed to comply with an applicable state procedural rule, and the last state court rendering judgment on the claim enforced the state procedural rule.

The final step in the analysis is to determine whether Michigan's contemporaneous objection rule is an adequate and independent ground for foreclosing federal habeas corpus review. A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). It is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial in 1999. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369 (1985). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with the state's independent and adequate state procedural rule, *i.e.* making a contemporaneous objection, caused him to default this claim in state court. *See Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977); *Lancaster,* 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996). Moreover, it is clear that the contemporaneous objection rule specifically regarding jury instructions was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d at 369-70; *People v. Curry*, 437 N.W.2d 310, 314

(Mich. Ct. App. 1989); *People v. Kendrick*, 195 N.W.2d 896 (Mich. Ct. App. 1972). This contemporaneous objection rule serves an important state interest in ensuring that counsel do their part in preventing trial courts from providing juries with erroneous instructions. *See Osborne v. Ohio*, 495 U.S. 103, 123 (1990) (holding that failure to urge the trial court to instruct was an adequate state law ground to prevent reaching the federal claim). Accordingly, review by this Court is barred unless Petitioner can show cause for defense counsel's failure to object to the trial court's response to the jury's question regarding self-defense, and prejudice attributable to the default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Carrier*, 477 U.S. at 485.

"To establish cause a petitioner must present a substantial reason to excuse his procedural default." *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). Petitioner has not attempted to explain the failure of trial counsel to make a contemporaneous objection to the trial judge's response to the jury's question. He did not raise a claim of ineffective assistance of trial counsel in his *pro se* application for leave to appeal to the Michigan Supreme Court or in his motion for relief from judgment. Thus, even if Petitioner had raised the issue of ineffective assistance of trial counsel in the instant habeas corpus petition, the Court is not permitted to consider any claim of counsel ineffectiveness that a petitioner did not properly present to the state courts. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000). Where a petitioner fails to show cause, the court need not consider whether he has established prejudice. *See Engle v. Isaac*, 456 U.S. 107, 134 n.43 (1982); *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003); *Simpson v. Jones*, 238 F.3d 399, 408 (6th Cir. 2000) (citing *Carrier*, 477 U.S. at 533).

Nor has Petitioner demonstrated that, not withstanding the procedural default, the Court should review the claim to avoid a fundamental miscarriage of justice. To secure review of a procedurally defaulted claim on that basis, a petitioner must show that the alleged constitutional error

"probably" resulted in the conviction of one who was actually innocent. *Schlup v. Delo*, 513 U.S. 298, 322 (1995) (citing *Carrier*, 477 U.S. at 495). This requires a petitioner to submit new and reliable evidence of his actual innocence, *id.*; *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003), demonstrating that no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 329.

Petitioner does not contend that he was actually innocent of fatally striking Alexander, but rather that his actions were justified by the doctrine of self-defense. There is some conflict among the circuits whether homicide justified by self-defense constitutes "actual innocence," as opposed to legal innocence, necessary to satisfy the *Schulp* standard. *Compare Fairman v. Anderson*, 188 F.3d 635, 645 (5th Cir. 1999) (finding that failure to consider eyewitness testimony in context of self-defense claim would constitute fundamental miscarriage of justice) and *United States ex rel. Bell v. Pierson*, No. 99 C 6467, 2000 WL 1810235, at \*5 (N.D. Ill Dec. 7, 2000) (finding ability to demonstrate self- defense would have established prisoner's actual innocence of crime charged) with *Ellis v. Hargett*, 302 F.3d 1182, 1186 n.1 (10th Cir. 2002) (finding that the "actual innocence" exception did not apply to petitioner's claim that he was innocent because he acted in self-defense); *Moleterno v. Nelson*, 114 F.3d 629, 636 (7th Cir. 1997) (holding that prisoner did not make a claim of "actual" innocence as opposed to "legal" innocence where prisoner argued self-defense); *cf. Harvey v. Jones*, No. 04-2487, 2006 WL 1208066, \*3 (6th Cir. May 2, 2006) (rejecting prisoner's argument that he was innocent by reason of self-defense, holding that the "actual innocence" necessary to entitled a prisoner to equitable tolling of the habeas statute of limitations means factual innocence as opposed to legal innocence). However, even assuming that new evidence of self-defense could show "actual innocence," Petitioner has not submitted any new evidence that would undoubtably demonstrate to a jury that he acted in self-defense.

17

Furthermore, even assuming ground I was reviewable by this Court, the claim has no merit.  A claim that a trial court gave an improper jury instruction is not cognizable on habeas review unless the petitioner shows that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977); s*ee also Estelle v. McGuire*, 502 U.S. 62, 75 (1991) (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000) (same).  The challenged instruction must be considered in the context of the instructions as a whole and of the entire record.  *Boyde v. California*, 494 U.S. 370, 380 (1990).  Where the trial court instructs the jury in accordance with state law and sufficiently addresses the matters of law at issue, no error results and the petitioner is not entitled to habeas relief.  *Sanders*, 221 F.3d at 869.  In this case, the trial judge instructed the jury on the elements of voluntary manslaughter, as well as the standard and burden of proof.  The trial judge did not decline to clarify his instructions with regard to the elements of voluntary manslaughter; the jury did not ask for clarification.  Twice the trial judge orally instructed the jury on self-defense, including the following:   "[a]sk yourself if the People have shown the following beyond a reasonable doubt . . . was the taking of Alexander Washington's life not done in self-defense," (Tr. V, 203), and "The Defendant does not have to prove that he acted in self-defense.  Instead the prosecution must prove beyond a reasonable doubt that the Defendant did not act in self-defense."  (Tr. V, 123).  Moreover, the jury was provided with written instructions on self-defense during its deliberation.  Under these circumstances, no reasonable juror could fail to understand that the prosecutor had the burden of proving Petitioner did not act in self-defense.

18

Accordingly, I find that Ground I is procedurally defaulted; and further, that the default may not be excused because Petitioner has not showed cause and prejudice, or that a manifest injustice would result without review by this Court.

III.   Grounds II, III, IV, V and VI

_____ As his fourth ground for relief, Petitioner claims he was denied his Sixth Amendment right to a jury venire selected from a fair cross-section of the community.  Petitioner first raised this issue in his *pro se* application for leave to appeal to the Michigan Supreme Court, and subsequently in his motion for relief from judgment, which was appealed to both the Michigan Court of Appeals and the Michigan Supreme Court. Accordingly, Petitioner exhausted the claim.

As his second ground for relief, Petitioner asserts a due process violation based on an alleged failure to secure the crime scene and the prosecutor's use of perjured testimony.  He claims prosecutorial misconduct as his third ground for relief[1]; the verdict was against the great weight of the evidence as his fifth ground for relief; and ineffective assistance of appellate counsel as his sixth ground for relief.  Petitioner first raised grounds II, III, V, and VI in his *pro se* motion for relief from judgment, which was denied by the trial court.  The Michigan Court of Appeals and the Michigan Supreme Court expressly denied Petitioner's application for leave to appeal on the basis that he failed to "meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(D)."

Under MICH. CT. R. 6.508(D)(2) and (3), a defendant may not collaterally attack a conviction based upon claims that were decided against him in a prior appeal or that could have been

---

[1]In his direct appeal, Petitioner raised prosecutorial misconduct on the basis of the prosecutor's questions while cross-examining Petitioner regarding Petitioner's conviction for breaking and entering a church.  In the instant petition, Petitioner's claim of prosecutorial misconduct is based upon the prosecutor's reference to Santa, Jesus and the spirit of Christmas during his opening statement, and his "false accusation" that Petitioner had been cut on the hand while removing an air conditioner, implying that Petitioner was guilty of theft or breaking and entering.

raised on direct appeal.  For claims that could have been raised on direct appeal, as is the situation here, the defendant is entitled to relief only if he can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand."  MICH. CT. R. 6.508(D)(3)(a)-(b).  The Sixth Circuit squarely has held that where the Michigan Supreme Court denies leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MICH. CT. R. 6.508(d)," the court has provided sufficient explanation that the decision was based on procedural default.  *Burroughs v. Makowski*, 282 F.3d 410 (6th Cir. 2002); *Simpson v. Jones*, 238 F.3d 399, 407 (6th Cir. 2000).  Petitioner, therefore, failed to comply with an applicable state procedural rule, and the last state court rendering judgment on the claims at issue actually enforced the state procedural rule.

The final question is whether MICH. CT. R. 6.508(D) is an "independent and adequate" state ground properly foreclosing federal habeas review of Petitioner's federal constitutional claims.  A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default.  *Rogers,* 144 F.3d at 992 (citing *Ford v. Georgia*, 498 U.S. at 423-24).  In assessing how "firmly" a state procedural rule has been established, the critical inquiry is whether, viewed from the time of the petitioner's later significant actions or inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence.  *Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir. 2000).  Because MICH. CT. R. 6.508(D) was enacted in 1989 and Petitioner's conviction and appeals took place thereafter, MICH. CT. R. 6.508(D) was a "firmly established" procedural rule for purposes of petitioner's action.  *See Luberda*, 211 F.3d at 1007; *Rogers*, 144 F.3d at 994.

20

When a petitioner has procedurally defaulted in the state courts, the federal habeas court will only entertain the defaulted issue if the petitioner can show "cause" for the procedural default and "actual prejudice" as a result of the alleged federal violation or can show actual innocence. *Coleman*, 501 U.S. at 750 (1991); *Lucas v. O'Dea*, 169 F.3d 1028, 1033 (6th Cir. 1999).  To show cause sufficient to excuse a failure to raise claims on direct appeal, petitioner must point to "some objective factor external to the defense" that prevented him from raising the issue in his first appeal. *Murray*, 477 U.S. at 488; *see McCleskey v. Zant*, 499 U.S. 467, 497 (1991).

In his sixth ground for habeas corpus relief, Petitioner asserts ineffective assistance of appellate counsel as cause for his failure to raise his claims on direct appeal.  A defense counsel's ineffectiveness in failing to raise issues on appeal in state court can suffice to establish cause for a procedural default only when the counsel's deficient performance rises to the level of a violation of a defendant's Sixth Amendment right to counsel.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Clifford v. Chandler*, 333 F.3d 724, 729 (6th Cir. 2003).  To serve as cause to excuse the default, a claim of ineffective assistance of counsel must be properly exhausted.  *Edwards*, 529 U.S. at 453; *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001).  Petitioner properly raised his claim of ineffective assistance of appellate counsel in his motion for relief from judgment and in all subsequent levels of appellate review. Thus, the claim was exhausted.  However, because the claim was rejected by the Michigan Supreme Court's application of MICH. CT. R. 6.508(D), the claim is also procedurally defaulted.  When faced with the same type of "double default" scenario, the Sixth Circuit noted:

> In theory, Petitioner could default on his ineffective assistance of appellate counsel claim and still use ineffective assistance of appellate counsel as cause to justify his other procedural defaults if he could meet the cause and

> prejudice requirements (or fundamental injustice requirement) with respect to the ineffective assistance of appellate counsel procedural default. Petitioner offers no arguments to support this rather circuitous route to relief, and none are apparent from the record.

*Knuckles v. Brigano*, No. 01-3425, 2003 WL 21771949, at *11 n.5 (6th Cir. July 22, 2003). Therefore, for Petitioner to use the claim of ineffective assistance of appellate counsel as "cause," he must first meet the "cause" and "prejudice" standard for the claim of ineffective assistance of appellate counsel itself. *See Edwards*, 529 U.S. at 453; *Mitchell*, 244 F.3d at 538; *Lancaster*, 324 F.3d at 436-37.

Petitioner asserts that he requested his appellate counsel to raise certain issues, appellate counsel refused to raise the issues, and further, refused to give Petitioner copies of his trial transcript, which in turn precluded Petitioner from raising the issues in a supplemental brief.  As a practical matter, it may have been difficult for Petitioner to raise his claim of ineffective assistance of appellate counsel on direct appeal to the Michigan Court of Appeals.  Petitioner, however, provides no explanation for his failure to raise his claim of ineffective assistance of appellate counsel in his subsequent application for leave to appeal before the Michigan Supreme Court, where he was proceeding *pro se*.  As Petitioner's claim of ineffective assistance of appellate counsel is procedurally defaulted, it may not be used to show cause for the default on his other claims.  *Carrier,* 477 U.S. at 489 (holding a claim of ineffective assistance of counsel must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default); *Burroughs v. Makowski*, 411 F.3d 665, 668 (6th Cir. 2005).  Accordingly, with respect to grounds II, III, IV, V, and VI, Petitioner has failed to establish cause and prejudice for his default.  Moreover, as discussed in section II, Petitioner has not presented any new and reliable evidence of his actual innocence.

Because grounds II, III, IV, V and VI are procedurally barred, this Court may not consider these issues

on habeas corpus review.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that Petitioner's habeas corpus

petition be denied.


Dated:  May 30, 2006                           /s/ Hugh W. Brenneman, Jr.
                                               Hugh W. Brenneman, Jr.
                                               United States Magistrate Judge



### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).